

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-11-2002

# USA v. Myers

Precedential or Non-Precedential: Precedential

Docket No. 01-3016

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation
"USA v. Myers" (2002). *2002 Decisions*. Paper 647.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/647

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed October 11, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3016

UNITED STATES OF AMERICA,

Appellee

v.

CLIFTON MYERS;
a/k/a SAMUEL JENKINS,

Clifton Myers,

Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal No. 00-cr-00591
District Judge: Hon. William H. Yohn, Jr.

Argued: April 8, 2002

BEFORE: McKEE, BARRY & ALARCON,*
Circuit Judges

(Opinion Filed: October 11, 2002)

_____

* The Honorable Arthur L. Alarcon, Senior Circuit Judge of the United
States Court of Appeals for the Ninth Circuit, sitting by designation.


Jonathan D. Libby, Esq. (Argued)
Elaine DeMasse, Esq.
Defender Association of Philadelphia
Suite 540 West--Curtis Center
Independence Square West
Philadelphia, PA 19106

 Attorneys for Appellant

Lesley S. Bonney, Esq. (Argued)
Office of the United States Attorney
Suite 1250
615 Chestnut Street
Philadelphia, PA 19106

 Attorney for Appellee

OPINION OF THE COURT

McKEE, Circuit Judge.

We are asked to review the district court's denial of a motion to suppress physical evidence that the defendant filed before entering a conditional guilty plea under Fed. R. Crim. P. 11(a)(2).1 The district court sentenced Clifton Myers to 15 years imprisonment after he pled guilty to possession of a firearm by a convicted felon, in violation of 18 U.S.C. SS 922(g)(1) and 924(e). On appeal, Myers contends that the district court erred in denying his motion to suppress. We agree.2

I. Background

On July 19, 2000, Philadelphia Police Officer Leonard Azzarano responded to a 911 radio call reporting a disturbance in an apartment involving a person with a gun. It was later discovered that the 911 call was placed by 12 year old Diane McKnight, who resided at the reported

_____

1. Myers reserved the right to challenge the district court's suppression ruling as part of his plea agreement.

2. The district court had jurisdiction pursuant to 18 U.S.C. S 3231. We have jurisdiction pursuant to 28 U.S.C. S 1291 and 18 U.S.C. S 3742(a).

residence with her mother.3 Upon arriving at the reported location, Officer Azzarano saw a young adolescent girl standing approximately two feet outside of the apartment door. The girl was later identified as Diane McKnight, the same girl who had placed the 911 call. McKnight told the officer that her mother and her mother's boyfriend were inside the apartment fighting. The girl also said that her mother's boyfriend had a gun.

After announcing that he was a police officer, Azzarano entered the first floor kitchen area but did not see anyone there. However, he heard raised voices and a lot of movement upstairs. Azzarano drew his gun, and again announced that he was a police officer. He then proceeded to the second floor where he encountered Lydia Bennett at the top of the stairs. The officer asked Bennett where the other person was, but Bennett told him that no one else was upstairs. Her voice was shaky and she appeared upset.

Azzarano then noticed a man standing behind a door, and the officer ordered him to come out at gun point. The man, later identified as the defendant, Clifton Myers, complied with the order. As Myers came from behind the door, he was carrying a black school bag. The officer ordered Myers onto the floor. As Myers got on the floor, he threw the black school bag down, and it landed about three feet from him. Officer Azzarano handcuffed Myers' hands behind his back as he was lying face down on the floor and proceeded to pat him down. The officer did not find anything during the pat-down.

Azzarano then asked Myers his name, and Myers

responded that it was "Samuel Jenkins." Two other officers then arrived on the scene, and they kept watch over Myers while Azzarano took Bennett downstairs to question her.4

---

3. Appellee's brief refers to the girl as "Diane Bennett," but Appellant's brief as well as the transcripts in the Appendix refer to her as "Diane McKnight."

4. Officer Azzarano explained that he "wanted to separate him [Myers] from his -- girlfriend, the girl's mom. . . . I wanted to take her downstairs because in my experience, a witness or a complainant to a domestic abuse is usually unlikely to -- to describe accurately what had happened in front of someone who is -- who had been abusing them for fear of retribution." App. at 74a.

3

During the brief questioning, Bennett told Azzarano that her boyfriend's name was "Clifton." As this name varied from the name Myers had first given, Azzarano returned to the second floor to again ask Myers his name. As he approached Myers, Azzarano noticed that Myers kept looking at the black bag he had set down when he was arrested. Myers also appeared to be getting increasingly nervous and Azzarano noticed that Myers' voice was shaking and halting.

Azzarano opened the bag and discovered a gun inside. Myers was thereafter charged in state court with a violation of Pennsylvania's Uniform Firearms Act. His prosecution was subsequently transferred to federal authorities who indicted him for violating 18 U.S.C. SS 922(g)(1) and 924(e), which makes it illegal for a convicted felon to possess a firearm. Prior to the scheduled trial date, the district court conducted the aforementioned suppression hearing on Myers' motion to suppress the gun. McKnight and Officer Azzarano testified at that hearing on behalf of the government.

At the conclusion of the hearing, the district court issued an oral ruling from the bench denying Myers' suppression motion. The court expressed concern that Myers had been charged with unlawful possession of a firearm even though the weapon was not discovered until after his arrest. However, the court reasoned that Officer Azzarano had probable cause to arrest Myers either for simple assault pursuant to 18 Pa. C.S.A. S 2701, domestic violence5 pursuant to 18 Pa. C.S.A. S 2711, or a violation of the Uniform Firearms Act pursuant to 18 Pa. C.S.A. S 6106 ("VUFA"). The court concluded that even though Myers ultimately was only charged in federal court with possession of a firearm by a convicted felon in violation of 18 U.S.C. SS 922(g)(1) and 924(e), this did not negate the probable cause to arrest him on other charges. The court

---

5. For purposes of clarity, we will use the term"domestic violence" to refer to the crime of simple assault committed in the context of a

domestic relationship. However, as discussed infra, domestic violence is not a substantive crime separate and distinct from simple assault under the laws of Pennsylvania.

4

found that the arrest was therefore valid and that the gun was properly seized pursuant to a search incident to that arrest. The court concluded:

> I find, basically, that the backpack was within the defendant's immediate control and, therefore, I conclude that this was a search incident to the arrest and as I believe the defendant agreed at the time of oral argument, although perhaps he has said something to the contrary in papers since that time.

App. at 171a.6 We disagree.

Although we conclude that Officer Azzarano's initial entry into the residence was justified, we hold that there was no probable cause to arrest Myers. Moreover, even assuming arguendo that Officer Azzarano had probable cause to arrest Myers, the suppression motion still should have been granted because the government has not satisfied its burden of establishing that the ensuing search was incident to a lawful arrest.

II. Discussion

A. Officer Azzarano did not have Probable Cause to Arrest Myers

Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested. See Beck v. Ohio, 379 U.S. 89, 91 (1964). The validity of an arrest is determined by the law of the state where the arrest occurred. See Ker v. California, 374 U.S. 23, 37 (1963) (plurality opinion).

---

6. The court's reference to the defendant's "concession" at oral argument is apparently based upon defense counsel's response to an inquiry the court made as counsel was arguing the suppression motion. However, we do not believe that a fair reading of this record establishes that defense counsel conceded that the gun was properly seized during a search incident to an arrest.

5

In reviewing a suppression order, we review the district court's findings of fact for clear error. See United States v. Roberson, 90 F.3d 75, 77 (3d Cir. 1996), citing Ornelas v. United States, 517 U.S. 690, 699-700 (1996). We have previously found that:

> [t]he determination that probable cause exists for a warrantless arrest is fundamentally a factual analysis that must be performed by the officers at the scene. It is the function of the court to determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense was being committed.

United States v. Glasser, 750 F.2d 1197, 1206 (3d Cir. 1984), citing Beck, 379 U.S. at 96. Our review of the district court's legal conclusion that probable cause existed is de novo. See Ornelas, 517 U.S. at 699.

We construe the record in the light most favorable to the government. See United States v. Riddick, 156 F.3d 505, 509 (3d Cir. 1998). However, in doing so we do not supply the testimony that the government failed to elicit during the suppression hearing. Similarly, we must refrain from drawing inferences that are either not supported by the record, or contrary to it, in an effort to uphold an arrest. See United States v. Kithcart, 134 F.3d 529, 536 (3d Cir. 1997) ("Kithcart I"), and United States v. Kithcart, 218 F.3d 213 (3d Cir. 2000) ("Kithcart II").

In reviewing on-the-scene judgments of police officers we must, of course, remember that police officers may well "draw inferences and make deductions . . . that might well elude an untrained person." United States v. Cort, 449 U.S. 411, 418 (1981). Nevertheless, an officer's inferences and deductions can only justify a warrantless arrest if the government satisfies its burden of establishing the probable cause necessary to support the arrest. Notwithstanding the deference afforded the on-the-scene conclusion of police officers, probable cause must ultimately be decided by the courts, not the police. Glasser, supra.

As noted earlier, the district court found probable cause to arrest Myers for either simple assault, domestic abuse, or a VUFA, and therefore denied the suppression motion.

We conclude, however, that the police did not have probable cause to arrest for any of those offenses. 7

1. Simple Assault

The district court concluded that Myers committed an "ongoing" simple assault in the presence of Officer Azzarano. See App. at 169a. The Dissent agrees. See Dissent at 53. However, the facts simply do not support a finding that Officer Azzarano witnessed a simple assault, or that a simple assault was "ongoing" in his presence.

The relevant portions of Pennsylvania's simple assault statute are as follows:

> (a). . . A person is guilty of assault if he:

        (1) attempts to cause or intentionally, knowingly or
        recklessly causes bodily injury to another;

        . . .

        (3) attempts by physical menace to put another in
        fear of imminent serious bodily injury. . . .

18 Pa. C.S.A. S 2701(a) (2002). Under Pennsylvania law,
simple assault is a misdemeanor. As noted above,
Pennsylvania law governs the validity of Myers' arrest. See
Ker, 374 U.S. at 37. The Pennsylvania legislature has
specifically limited the authority of police officers to make
warrantless arrests for misdemeanor offenses. An officer
may conduct a warrantless arrest for a misdemeanor only
if the offense is committed in the presence of the arresting
officer or when specifically authorized by statute. See Pa. R.
Crim. P. 502; Commonwealth v. Clark, 735 A.2d 1248, 1251
(Pa. 1999); Commonwealth v. Bullers, 637 A.2d 1326, 1329
(Pa. 1994). Officer Azzarano arrested Myers without a
warrant. Therefore, Azzarano's arrest for simple assault is
not authorized under Pennsylvania law unless the record
establishes that a simple assault occurred in his presence.

_____

7. The district court ruled that the arrest occurred when Myers was
ordered to the floor and handcuffed behind his back, and we agree. See
California v. Hodari D., 499 U.S. 621, 626 (1991). Moreover, neither
party contests that Myers was arrested rather than "detained" at that
point.

Absent actual injury, subsection (1) of the simple assault
statute requires an attempt to cause bodily injury. See 18
Pa. C.S.A. S 2701(a)(1). Moreover, Pennsylvania requires
"specific intent to cause bodily injury," in order to commit a
simple assault. Interest of J.L., 475 A.2d 156, 157 (Pa.
Super. 1984) (emphasis added).

Although Azzarano heard Myers and Bennett quarreling,
the officer never testified that he believed that Myers
intended to injure Bennett.8 The Dissent suggests that the
information from the police radio, combined with
McKnight's statement upon Azzarano's arrival, led the
officer to reasonably conclude that an armed man was
fighting with "the informant's" mother. See Dissent at 46.9

In recounting the facts, the Dissent notes that McKnight
"is the oldest of six children." Id. That may be interesting
background, but it has nothing to do with the legality of
Azzarano's actions. See United States v. Ubiles , 224 F.3d
213, 218 (3d Cir. 2000). It is clear that he had no
knowledge of how many brothers and sisters McKnight had,
or how many of them lived at that address. The only
testimony regarding the number of siblings and the identity
of who lived in the apartment came from McKnight at the
suppression hearing. See App. at 59a. Moreover, from the
record it appears that none of her brothers or sisters was

home during this incident.10

_____

8. As noted above, the officer did explain that he took Bennett
downstairs because of a concern that she may not be candid in Myers'
presence based upon a fear of retaliation. However, that does not
amount to a reasonable belief that Myers had committed a simple
assault in the officer's presence. The government had every opportunity
to establish that, but never even attempted to elicit any such testimony.
9. In describing McKnight as an "informant," the Dissent is apparently
attempting to draw support from cases that hold that information from
a reliable informant (such as McKnight) can support probable cause to
search under the Fourth Amendment. However, as we discuss in more
detail below, the inquiry into the probable cause to search (and the
related focus on the reliability of an "informant)," is not the equivalent of
an inquiry into probable cause to arrest. Steagald v. United States, 451
U.S. 204 (1981).
10. Moreover, if the government had established that Azzarano
reasonably believed that Myers was assaulting Bennett, and that such
assault occurred in the officer's presence, the number of children in the
house would be irrelevant.

8

Myers could properly have been arrested for simple
assault under subsection (3) only if Azzarano reasonably
believed that Myers was menacing Bennett to such an
extent as to "put [her] in fear of imminent serious bodily
injury[.]" 18 Pa. C.S.A. S 2701(a)(3). Azzarano believed there
was a gun in the house, and common sense suggests that
one can menace someone within the meaning of subsection
(3) by waving a gun during an argument. See
Commonwealth v. Savage, 418 A.2d 629, 632 (Pa. Super.
1980). However, there is no evidence that Myers pointed a
gun at Bennett in Azzarano's presence or otherwise, and
nothing supports the inference that Azzarano thought he
had. The Dissent concludes that "Myers' conduct in Officer
Azzarano's presence constituted an attempt by physical
menace to put Ms. Bennett in fear of imminent serious
bodily injury." Dissent at 56. However, Azzarano said that
the only thing Myers did in his presence was hide behind
a door. See App. at 70a-71a.

Azzarano's own statement of what he reasonably
concluded from Myers' actions appears on the record. We
need not read between any lines. The officer testified that
he pointed his gun at the door and ordered Myers to come
out. When asked what happened next, he explained:"At
that point, I was still by myself in the house and to be
honest with you, did not know exactly what was going on.
I handcuffed the male and placed him under arrest." Id. at
71a. There is no testimony that Azzarano believed that
Myers "menaced" anyone from behind the door by pointing
a weapon at either Azzarano or Bennett. Although the
officer certainly acted prudently in ordering Myers from
behind the door, this does not mean that Myers was
assaulting either Azzarano or Bennett as he hid from the
officer, and any finding to the contrary is clearly erroneous.

Officer Azzarano offered the following account of the arrest to the district court:

> THE COURT: You said you arrested him. What did you arrest him for?
>
> OFF. AZZARANO: At that point, I was arresting him for domestic assault.
>
> THE COURT: And, what does that mean?

9

> OFF. AZZARANO: Well, I was arresting him for -- I could have been arresting him for terroristic threats or domestic -- violations of domestic assault. . . .
>
> * * *
>
> THE COURT: Well, I'm not familiar with a crime of domestic assault. That's why I'm asking.
>
> OFF. AZZARANO: . . . the arrest for actually terroristic threats and, like I said, for domestic assault. That would be assault or some type of threat level towards someone who he had had a previous relationship with.
>
> * * *
>
> THE COURT: You mentioned terroristic threats, what was the threat?
>
> OFF. AZZARANO: At that -- that's what I was -- that's what I was trying to determine at that time. I should -- I said domestic assault. What I meant to say, in fact, was domestic abuse.
>
> THE COURT: Well, but you said terroristic threats. What was the threat?
>
> OFF. AZZARANO: The threat that -- the threat would be a handgun.

Id. at 72a-73a (emphasis added).

The Dissent argues that Azzarano testified that he arrested Myers for domestic assault because of his terrorist threats with a handgun and suggests that our "refusal . . . to accept Officer Azzarano's undisputed testimony concerning the inferences he drew, based on the totality of the circumstances, is contrary to our duty as appellate judges . . . ." Dissent at 52. However, the only fair interpretation of Azzarano's testimony is that he concluded that Bennett had been in a quarrel with Myers, and that Myers had a gun. That does not establish a reasonable belief that Myers had assaulted Bennett, and it certainly does not establish any assault in the officer's presence.[11]

11. As we discuss below, it is not a crime to possess a gun inside of one's own home in Pennsylvania, see 18 Pa. C.S.A. S 6106(a), and nothing on the record suggests that Officer Azzarano believed Myers did not live with Bennett or that he did not have the right to possess a gun.

Officer Azzarano's own explanations of his actions refute a finding that Myers was assaulting anyone from behind the door. Azzarano ordered Myers to the floor and arrested him not because Myers assaulted Azzarano (or Bennett), but because the officer was attempting to get control of the situation for his own safety. As noted above, he testified that he was alone at that time and "did not know what was going on." App. at 71a. However, the fact that it was prudent to get control of the situation does not create the probable cause necessary for an arrest. See Terry v. Ohio, 392 U.S. 1 (1968).

In fact, at oral argument, the Assistant United States Attorney attempted to analogize Azzarano's actions to a stop and frisk sanctioned by Terry v. Ohio, and the government devotes an entire section of its brief to arguing that "[t]he search of the bag was valid for a separate reason, as incident to a valid Terry search." Government's Br. at 23 - 6. However, Terry has never been applied inside a home. Even assuming arguendo that Terry could be stretched to cover Officer Azzarano's actions in a private home, Terry would only allow the officer to exercise control over Myers to protect himself and secure the situation. See Ubiles, 224 F.3d at 217. A Terry stop cannot justify an arrest unless additional developments that arise during the course of the temporary detention establish the necessary probable cause for an arrest. See Florida v. Royer, 460 U.S. 491, 507 (1983). However, there are no such additional circumstances here.

The Dissent concludes that Myers' "menacing" behavior constituted an ongoing assault on both Bennett and Officer Azzarano, because the "threat of imminent harm to Ms. Bennett from an armed man did not cease." Dissent at 53. However, as we have noted, this record does not establish that Myers' attempt to avoid detection by hiding behind a door constituted a simple assault of either Bennett or Officer Azzarano, and the officer's testimony is not to the contrary.

We realize that some of Azzarano's testimony could, if taken out of context, support a finding that Myers and Bennett had been involved in a physical altercation, or that it was reasonable for Azzarano to have thought so. Such an

altercation could support an inference that Myers actually intended to injure Bennett, or that he had put her in fear of imminent serious bodily injury. This is especially true

given the information about a gun. It appears that the district court's conclusion that Azzarano could have arrested Myers for simple assault is based upon just such an interpretation of the record, and the Dissent interprets the record in a similar fashion. However, when fairly viewed in context with all of the testimony here, the district court's finding that Azzarano reasonably concluded that Myers and Bennett were "fighting" within the meaning of a simple assault is clearly erroneous.12

The testimony establishes only that Azzarano believed that Myers and Bennett had been "fighting" in the sense of a verbal quarrel. It does not support a finding that he believed they were engaged in a physical altercation or struggle. It is also obvious that more than a verbal argument is required to commit the crime of simple assault under Pennsylvania law, and we suspect Pennsylvania law is not unique in that regard.

Azzarano testified that, before entering the house,"the girl outside had stated that her mom was inside arguing with her boyfriend." Id. at 68a (emphasis added). Azzarano also recalled that McKnight told him that the boyfriend had a gun. See id. at 64a. When Azzarano encountered Bennett inside her home, her appearance and demeanor led Azzarano to conclude, not that she had been in a physical fight or threatened by an armed boyfriend, as the Dissent and district court conclude, but that she had been arguing. Officer Azzarano testified:

> Her voice was shaky, she seemed upset and seemed that she had not -- it didn't seem that she had just been involved in a normal discussion with someone. She seemed that she had been involved in some type of dispute.

---

12. As we have stressed, even assuming that Azzarano believed that a physical altercation occurred between Myers and Bennett, it was clearly not in his "presence" as he was on the first floor and the quarrel took place out of sight on the second floor. Accordingly, the arrest would still not have been authorized under Pennsylvania law.

12

Id. at 69a (emphasis added). Azzarano did not say that he heard anything that would be consistent with a physical altercation. He did not, for example, hear pushing, or furniture being thrown about or breaking. Nor did he hear anyone scream for assistance. He did not even testify that he heard anyone cursing. He merely heard two raised voices and "more than one set of footsteps . . . ." Id. Significantly, defense counsel objected to the characterization of a "fight" at one point during Azzarano's testimony. App. at 65a. The court overruled the objection and reminded defense counsel that he could "explore it in more detail through questioning," on cross examination. Id. The prosecutor decided not to wait for cross examination, and attempted to elicit that detail by asking Azzarano:

"could you be a little more specific about what it was that you heard and why you thought it was a fight?" Id. The officer responded to that invitation as follows:"I heard raised voices, I heard a lot of movement upstairs that did not sound like just a normal discussion." Id.

The Dissent would minimize the significance of such testimony by suggesting that we are engaging in a"divide and conquer analysis" that ignores the totality of the circumstances. See Dissent at 41. However, it is only by placing the use of the term "fight" in its proper context on this record that we can fairly evaluate Officer Azzarano's testimony, and the totality of the circumstances inside Bennett's home when Myers was arrested. Clearly, we can not ignore the totality of the circumstances and focus on an isolated word in determining what the officer meant when he testified about a "fight."

The district court attached a great deal of significance to Azzarano's observations of Bennett's demeanor, and the condition of her home. The officer testified that the house was "in disarray, especially the upstairs where they had been[,] . . . also the demeanor of the woman when I found her she seemed upset and visibly shaken." App. at 104a. This also falls short of establishing that an assault occurred in the officer's presence. The record is devoid of any suggestion that the level of disarray was excessive to the point of being probative of a physical altercation. The most that we can conclude from the officer's description of

13

the state of the apartment is that it was messy. Despite having every opportunity to do so, the government never established that the appearance of the home justified a conclusion that any physical altercation had occurred there, and we can not supply that testimony for the government by drawing inferences that stretch the testimony beyond the parameters of this record. See Kithcart I, supra.

The Dissent believes that our conclusion that the evidence only establishes that the residence was"messy," rather than evidencing a physical altercation, is an example of appellate fact finding and reweighing of evidence. See Dissent at 52. On the contrary, our conclusion is nothing more than the appropriate discharge of our function as a reviewing court. It is the officer's testimony , not his credibility, that leaves a void in the government's proof. Although we must interpret his testimony in the light most favorable to the government and afford it the benefit of all reasonable inferences, our appellate function neither allows us to turn a blind eye to the holes in the government's proof, nor engage in the level of speculation that would be necessary to spackle over them. We do not conclude that the apartment was not in "disarray." Rather, we conclude that the government has not satisfied its burden of establishing that the appearance of the apartment (i.e. the "disarray") was such as to support a reasonable conclusion

that a physical altercation had occurred there. In realizing that the government has failed to meet this burden, we do not "ignore[ ] Officer Azzarano's daily experience in investigating domestic disputes and his prior observations of the condition of residences where violations of S 2701(a)(3) have occurred." Id. We are merely noting that Officer Azzarano never compared the appearance of Bennett's residence to other residences where he had investigated claims of domestic abuse. That comparison is one of the missing links that invites speculation. It should be furnished by Azzarano's testimony, not by "appellate fact finding" as to how Bennett's residence compared to others that Azzarano had investigated.

As defense counsel noted in argument at the close of the evidence at the suppression hearing: "[t]here's no

information that anything was broken. There's no information that the doors or windows or furniture or plates or anything else was broken in the house that would indicate there was some type of a dispute going on." App. at 130a. Clearly, nothing was broken in the officer's presence. To the extent that the district court concluded that Officer Azzarano's testimony established a reasonable belief of a "fight" in the sense of a physical altercation between Bennett and Myers in the officer's presence or otherwise, the court's finding was clearly erroneous. Although we defer to the suppression court's findings, we do not function as a rubber stamp. See United States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993) (referring to review of magistrate's determination of probable cause for issuance of a search warrant).

Azzarano explained his apprehension upon seeing Myers hiding behind the doorway as follows:

>       [S]omething had happened there or something was
>       happening and there would be no reason for him to
>       hide from me if, in fact, it was just a simple argument
>       between two parties.

App. at 70a. Thus, Azzarano testified that he was suspicious because hiding behind a door at the approach of a police officer is inconsistent with a "simple argument." Azzarano explained that he pointed his gun at the door Myers was hiding behind "because I believed he had a gun in his possession based upon the fact that the little girl had said so." Id. at 71a (emphasis added). He did not base his conclusion that Myers was armed on anything he heard or saw after he entered the residence. Azzarano candidly conceded that he arrested Myers because he was still by himself in the house and, "to be honest with you,[I] did not know exactly what was going on. I handcuffed the male and placed him under arrest." Id. Thus, we can not conclude that Azzarano had probable cause to arrest for assault without equating uncertainty and apprehension to probable cause. See Terry, supra.

Based upon our review of this record we conclude that a finding that an assault was "ongoing" in the officer's presence is clearly erroneous. We therefore hold that the

15

government failed to satisfy its burden of establishing that the police had probable cause to arrest Myers for simple assault.

2. Domestic Violence

The district court also concluded that Officer Azzarano was justified in arresting Myers under Pennsylvania's domestic violence law, 18 Pa. C.S.A. S 2711. That statute allows police officers to make a warrantless arrest for simple assault of a family or household member based upon probable cause even if the offense was not committed in the presence of the officer. The statute provides:

> A police officer shall have the same right of arrest without a warrant as in a felony whenever he has probable cause to believe the defendant has violated . . . S 2701 (relating to simple assault) . . . against a family or household member although the offense did not take place in the presence of the police officer.

18 Pa. C.S.A. S 2711 (2002).

Officer Azzarano's testimony establishes that he regarded S 2711 as proscribing a substantive offense called "domestic abuse," "domestic violence," or "domestic assault."[13] However, S 2711 does not define a substantive offense. Rather, it merely authorizes the police to make a warrantless arrest for certain specified misdemeanors, including simple assault, even though the crime was committed outside the presence of the officer. See Commonwealth v. Smith, 552 A.2d 292, 295 (Pa. Super. 1988) ("PA. R. CRIM. P.101 [now PA. R. CRIM. P. 502] allows an arrest without a warrant on probable cause when the offense is a misdemeanor not committed in the presence of

_____

13. For example, at one point in his testimony Officer Azzarano testified: "it seemed to me that a domestic abuse -- that crime had been committed." App. at 105a (emphasis added). As we noted earlier, domestic violence is not a crime substantively distinct from simple assault. See Commonwealth v. Smith, 552 A.2d 292, 295 (Pa. Super. 1988) ("The statute [S 2711] added to the list of offenses which allow police officers to make warrantless arrests . . .[i]t does not create a new class of criminal offenses.")

16

the officer only when such arrest is specifically authorized by statute."). However, the crime must be committed in the context of a domestic relationship, and there must still be

probable cause to arrest for the underlying substantive offense; in this case, simple assault.

Moreover, the arrest authority conferred by the statute is limited by the following proviso: "a police officer may not arrest a person pursuant to this section without first observing recent physical injury to the victim or other corroborative evidence." 18 Pa. C.S.A. S 2711.

The district court concluded that there was sufficient corroboration to sustain an arrest under S 2711. The court noted:

> When he [Officer Azzarano] arrived upstairs, he encountered Cydia Bennett in the hallway. Her voice was shaky. She was upset as if she had just been involved in an altercation. She denied that anyone else was in the house.
>
> He also observed that the house was in disarray as if there had been a struggle and he reasonably concluded from Bennett's demeanor that this was consistent with that of a domestic abuse victim reluctant to walk away with the police in the presence of the offender.

App. at 167a-168a (emphasis added).

We have already explained why the testimony does not support a finding that the officer had a reasonable belief that Myers had been involved in a physical altercation with Bennett. Likewise, the testimony does not corroborate that a "struggle occurred or that the officer thought one had." The officer's testimony establishes only that he believed there had been a "dispute" not a "struggle." It is worth repeating that when the Assistant United States Attorney attempted to clarify the officer's testimony by asking him to be more specific about "fighting" the officer merely confirmed that he believed that it was not a "normal discussion. . . ." Id. at 65a. We therefore can not conclude that the officer believed Bennett and Myers had been involved in a physical altercation without supplying testimony for him.

17

Moreover, S 2711 only applies when an assault has been committed "against a family or household member[.]" 18 Pa. C.S.A. S 2711. Officer Azzarano admitted that he could not determine whether Myers shared the bedroom with Bennett or not. He did not see any personal effects belonging to a male in the bedroom area. See App. at 103a. Accordingly, there was even less probable cause to arrest for a violation of S 2711 than for a violation of S 2701 (simple assault).

3. Violation of the Uniform Firearms Act ("VUFA")

The district court reasoned that if Myers did not live in the house with Bennett he could not lawfully have a gun there without a license, and therefore he could have been

arrested on a VUFA charge. The court further reasoned that, on the other hand, if Myers did live with Bennett, he could have been arrested under S 2711 for domestic violence even though he could not then have been arrested for a VUFA. However, the district court's reasoning ignores the requirements of the respective statutes.

Under Pennsylvania law, it is a third degree felony for a person to carry an unlicensed weapon "on or about his person, except in his place of abode or fixed place of business[.]"14 18 Pa. C.S.A. S 6106(a)(1). Inasmuch as it is not a crime to possess a gun inside one's own residence, the mere fact of possessing a gun inside a residence can not supply probable cause to arrest for a VUFA violation. The district court justified a possible VUFA arrest by reasoning that if the apartment was not Myers' residence, then there was sufficient probable cause to arrest him for the gun charge. As noted earlier, Azzarano did not know where Myers lived before arresting him, nor did he testify about any reasonable belief regarding Myers' residence. See App. at 103a. Therefore, the fact that Azzarano did not know if Myers was being arrested in his own home is fatal to the reasonableness of the warrantless arrest for a VUFA

_____

14. Law enforcement officials and certain other individuals authorized by statute to carry weapons outside the home or business are excepted from this provision. See 18 Pa. C.S.A. S 6106(b). The statute reduces the offense to a first degree misdemeanor if the individual has not committed any other crimes. See id. at S 6106(a)(2).

18

charge.15 See Ubiles, 224 F.3d at 217 (mere possession of a gun on a public street can not supply necessary suspicion to support even a Terry stop absent reasonable suspicion that the possession itself is unlawful).

Moreover, the gun could not itself have provided probable cause to arrest Myers because it was not discovered until after he was arrested. It is axiomatic that "[a]n arrest is not justified by what the subsequent search discloses[.]" See Henry v. United States, 361 U.S. 98, 103 (1959). Myers' bag was not searched until after he had been arrested.16 We therefore hold that Azzarano did not have probable cause to arrest Myers.

The Dissent argues that "probable cause existed to arrest Myers before Officer Azzarano crossed the threshold," Dissent at 42, and argues that we have failed to explain how we can conclude that Officer Azzarano's entry was justified and still hold that he did not have probable cause to arrest Myers after the officer was inside the home. Id. at 43. This is based on the Dissent's belief that holding that Azzarano's entry was justified necessarily means that the entry was supported by both probable cause and exigent circumstances. Our colleague cites Kirk v. Louisiana, 536 U.S. ___, 122 S. Ct. 2458, (2002) (per curiam), and Fisher v. Volz, 496 F.2d 333, 339 (3d Cir. 1974), to support that

position. Id. As we note supra at note 9, the Dissent is mistakenly equating the circumstances that justified Azzarano's entry to investigate with the probable cause required to arrest someone he found inside the home during that investigation. Our colleague thus conflates two similar, but distinct inquiries.

_____

15. The totality of Azzarano's testimony establishes that Azzarano did not think the arrest was for a weapons offense at all. Rather, that charge was determined by the District Attorney's Charging Unit after the fact. Although there is nothing wrong with that unit determining the appropriate offense with which to charge Myers, it is the reasonableness of Azzarano's belief that controls our probable cause analysis. See Beck, 379 U.S. at 91.

16. Thus, we do not need to reach the issue of whether an arresting officer must have probable cause to believe a defendant is not licensed to carry a firearm. See App. at 172a.

The Fourth Amendment serves two distinctly separate, though often intertwined interests. The probable cause necessary for an arrest requires a showing "that probable cause exists to believe that the subject [in the case of an arrest warrant] has committed an offense and thus. . . primarily serves to protect an individual from an unreasonable seizure." Steagald v. United States, 451 U.S. 204, 213 (1981). However, the probable cause necessary to search "safeguards an individual's interest in the privacy of his [or her] home and possessions. . . ." Id. The facts in Steagald were the converse of the facts here, but the Court's Fourth Amendment clarification and distinction is no less applicable to Azzarano's entry, or Myers' arrest.

In Steagald, the police had an arrest warrant for a suspect named "Lyons" and entered Steagald's home without a warrant in search of Lyons. While inside searching for Lyons, they discovered cocaine and Steagald was subsequently convicted of the illegal possession of that controlled substance. In reversing the conviction, the Court held that, although the arrest warrant authorized seizure of Lyons, it did not allow police to enter Steagald's residence unless that entry was supported by probable cause, exigent circumstances or consent. 451 U.S. at 206. The Court had noted this distinction in Texas v. Brown, 460 U.S. 730, 747 (1983). There, in discussing the limitations on the "plain view" doctrine, the Court stated:

> Although our Fourth Amendment cases sometimes refer indiscriminately to searches and seizures, there are important differences between the two that are relevant to the plain view doctrine. The Amendment protects two different interests of the citizen-- the interest in retaining possession of property and the interest in maintaining personal privacy. A seizure threatens the former, a search the latter.

460 U.S. at 748 (emphasis added).

The information Azzarano received from the 12 year old girl standing two feet outside her residence certainly created a sufficient exigency to allow Azzarano to enter her home to investigate. It did not, however, authorize him to arrest anyone he found inside.17 Moreover, as the district

_____

17. The contrary view advocated by the Dissent would hold that Azzarano would have been justified in arresting Myers even if he and

20

court noted, McKnight consented to the officer's"intrusion." In discussing the suppression ruling, the district court noted that if McKnight did not "direct[ ]" Azzarano to enter her home, she at the very least consented to it. 18 Accordingly, we can not agree with the Dissent's attempt to redefine our inquiry by arguing that "probable cause existed to arrest Myers before Officer Azzarano crossed the threshold." Dissent at 42. Our colleague characterizes the district court's analysis as being a "well-reasoned discussion of the pertinent facts and the applicable legal principles . . .". Id. at 48. However, nowhere does the district court so much as suggest that Azzarano's entry furnished the necessary probable cause to arrest Myers inside Bennett's home. In fact, the court's entire analysis is to the contrary. Moreover, the prosecution does not even attempt to uphold this arrest by suggesting that Azzarano had probable cause to arrest Myers simply because circumstances justified his entry into Bennett's home.

Our colleague rests much of his argument that Azzarano's initial entry allowed him to arrest Myers on our opinion in Fisher v. Volz, 496 F.2d 333, 339 (3d Cir. 1974), and the Supreme Court's ruling in Kirk v. Louisiana, 536 U.S. ___, 122 S. Ct. 2458, (2002) (per curiam). In Kirk, the state court had upheld a warrantless arrest inside the defendant's home based upon the officers' reasonable belief that the defendant had sold drugs, and that delay would jeopardize the evidence. Police obtained an arrest warrant, but only after the defendant had been arrested. The state

_____

Bennett were in the middle of a peaceful dinner, sharing jokes and laughing, when Azzarano "crossed the threshold simply because Azzarano's initial entry was justified."

18. The district court stated, "I find that the officer, in fact, did have an implied invitation, if not a direction by McKnight to enter the home and stop a potentially deadly situation." App. at 167a. The defendant does not focus on that finding on appeal, and we therefore need not decide if a minor can "consent" to a police entry of her adult parent's residence under the Fourth Amendment. We note this aspect of the case only to ensure that the nature of Azzarano's Fourth Amendment "intrusion" be kept in context, and to further explain why that intrusion does not support any arrest he may have made thereafter.

court had characterized the defendant's assertion that no exigent circumstances justified the warrantless intrusion as of his home as "irrelevant." 122 S.Ct. at 2459. In a per curiam opinion that is less than two pages long, the Court remanded and instructed the state court to determine if exigent circumstances justified the entry.

We are also not persuaded by our colleague's citation to our opinion in Fisher. There, several plaintiffs sued the Newark Police Department and various police officers based upon a practice of conducting warrantless searches of the plaintiffs' apartments in search of someone who was named in an arrest warrant. We noted that we had not previously decided a case "involving entry into a third party dwelling in reliance on only a valid arrest warrant," and we then surveyed the decisions of courts that had addressed that issue. We held that "police may not constitutionally enter the home of an innocent citizen in search of a suspected offender for whom they have a valid warrant, even under exigent circumstances, unless they also have probable cause to believe that the suspect will be found on the premises." 496 F.2d at 342-3. Even if Fisher could somehow be stretched to suggest that police may arrest someone they find inside a residence based solely upon the legality of the entry, we would still have to note that we decided Fisher seven years before the Supreme Court decided Steagald and clarified the different Fourth Amendment interests arising from the distinction between a search on the one hand, and a seizure (i.e. arrest) on the other.

Given the distinct inquiry and interests implicated when considering the Fourth Amendment's protection from illegal seizures, as opposed to illegal searches, we conclude that, despite the exigent circumstances that allowed Azzarano to enter this residence, he did not have probable cause to arrest Myers once he got inside.[19] Accordingly, the evidence

_____

19. See also United States v. Sheik-Abdi, 37 F.3d 1240 (7th Cir. 1994). The court in Sheik-Abdi distinguished between exigent circumstances that would justify a warrantless entry into a home, and probable cause needed for arrest. See id. at 1246. Though the facts are arguably distinguishable from the circumstances of Azzarano's entry (paramedics

that was seized pursuant to that arrest should have been suppressed.[20] Furthermore, even if we assume arguendo that the arrest was lawful, we would still find that the gun should have been suppressed as the subsequent search was not incident to the arrest.

B. The Search Was Not Incident To An Arrest

"[W]hen an arrest is made, it is reasonable for the

arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." Chimel v. California, 395 U.S. 752, 762-63 (1969). This exception to the general warrant requirement arises from a common

---

were summoned to the arrestee's home when his wife called an ambulance after he passed out, and they in turn called police when Sheik-Abdi became belligerent and aggressive), the analysis is relevant because it clearly distinguishes between the privacy interests presented by the Fourth Amendment's search warrant requirement, and the requirement of probable cause to arrest. The court stated:

> Once the veil of the home has been legally pierced, we see no need for police officers to turn a blind eye to crime, so long as the arrest is otherwise effected in compliance with the constitutional requirement of probable cause (and other relevant state law).

Id. (emphasis added) (parenthetical in original). See also Parkhurst v. Trapp, 77 F.3d 707, 711 (3d Cir. 1996) (concern for the safety of others can justify warrantless entry into private residence).

20. The Dissent suggests that by insisting that the prosecutor elicit sufficient evidence to support a finding of probable cause for a warrantless arrest, we are confusing the "quantum of evidence required to demonstrate probable cause for an arrest with the heavy burden placed on the Government to present sufficient evidence of each element of a crime that persuades the trier of fact of the guilt of the defendant beyond a reasonable doubt." Dissent at 50, citing Draper v. United States 358 U.S. 307, 312 (1959). However, we do not insist that the government prove the elements of the various crimes that Myers could theoretically have been arrested for. We do, however, insist that the government satisfy its burden of establishing a reasonable belief that Myers assaulted Bennett in the officer's presence inside this private residence, or a reasonable belief that Myers had committed one of the other crimes that the district court concluded he could have been arrested for.

23

sense acknowledgment of the dynamics of an arrest, the right of privacy, and the need to allow police officers to protect themselves. It is a carefully tailored and narrowly crafted license that addresses the tension between the need for effective law enforcement on the one hand, and constitutionally guaranteed liberty on the other. Accordingly, the scope of such a search must be "strictly tied to and justified by the circumstances which rendered its initiation permissible." Id. at 762 (internal quotations omitted). A search incident to arrest is therefore only "reasonable" within the meaning of the Fourth Amendment when it is confined to, and controlled by, the circumstances that warrant the intrusion.

Thus, although it might appear "reasonable" for an arresting officer to conduct a search that is as broad as possible following an arrest, the Constitution does not allow it. As the Supreme Court explained in Chimel:

It is argued . . . that it is reasonable to search a man's house when he is arrested in it. But that argument is founded on little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests. Under such an unconfined analysis, Fourth Amendment protection in this area would approach the evaporation point. It is not easy to explain why, for instance, it is less subjectively reasonable to search a man's house when he is arrested on his front lawn--or just down the street--than it is when he happens to be in the house at the time of arrest.

Id. at 764-65 (internal quotation marks omitted).

Although this constitutional principle is now well established, its application has been uneven, and determining the contours of "reason" within the confines of Fourth Amendment privacy interests has led to anything but consistent results.

At the outset, we note that a search incident to arrest has both geographic and temporal limitations:

A legitimate search incident to arrest is limited to the arrestee's person and to the area within his immediate

24

control, meaning the area from which he might gain possession of a weapon or destructible evidence.

United States v. Hudson, 100 F.3d 1409, 1419 (9th Cir. 1996) (internal quotation marks omitted), citing Chimel, 395 U.S. at 763. In United States v. Abdul-Saboor , 85 F.3d 664 (D.C. Cir. 1996), the D.C. Circuit Court of Appeals noted that, in determining if an object is "conceivably accessible to the arrestee," we are to assume that "he was neither an acrobat [nor] a Houdini." Abdul-Saboor , 85 F.3d at 669 (D.C. Cir. 1996), citing United States v. Lyons , 706 F.2d 321 (D.C. Cir. 1983). We can safely assume that Myers was neither. Yet, inasmuch as he was handcuffed behind his back while lying face down on the floor, and "covered" by two armed police officers when Azzarano returned and searched the bag, Myers would have had to possess qualities of both if we are to conclude that he had access to the bag at that point.

The court in Abdul-Saboor actually upheld the search there citing our analysis in Virgin Islands v. Rasool, 657 F.2d 582 (3d Cir. 1981). However, the circumstances that caused the court to uphold the search are quite different from the circumstances here.

In Abdul-Saboor, the arrestee attempted to retrieve a loaded shotgun after police entered his room, and he "specifically requested entry to the area to be searched." Abdul Saboor, 85 F.3d at 670. Moreover, a second gun and magazine had been discovered in his apartment before the

search. In upholding the search, the court in Abdul-Saboor took pains to distinguish its earlier holding in United States v. Lyons, 706 F.2d 321 (D.C. Cir. 1983), wherein the court had reversed the district court's order denying suppression. The Abdul-Saboor court noted that in Lyons, the arrestee was handcuffed, the closet that was searched was several yards away, six police officers were in the room with Lyons, and no weapons had yet been uncovered. See Abdul-Saboor, 85 F.3d at 670, citing Lyons, 706 F.2d at 330-31. Moreover, Lyons never made any attempt to reach the closet and Lyons had collapsed and been revived before the search began. See Abdul-Saboor, 85 F.3d at 670, citing Lyons, 706 F.2d at 324.

In contrast, the arrestee in Abdul-Saboor indicated that he would reach for a weapon if given the opportunity, and he was not suffering from any "infirmity that would impede his physical ability." Abdul-Saboor, 85 F.3d at 670. Therefore, the court in Abdul-Saboor was persuaded by the arresting officers' concern over Abdul-Saboor's ability to grab concealed weapons, notwithstanding the fact that he was physically restrained.

Significantly, the Abdul-Saboor court noted:

> Absent some objective basis upon which to conclude that the arresting officer had no reason to fear either the arrestee or the environment in which the arrest unfolded, we agree with our sister circuits that a search of the area where the arrest occurred in circumstances such as this case presents is a search incident to arrest.21

Id. (emphasis added). The court then cited numerous cases to support that proposition. However, the cases cited by Abdul-Saboor, as well as those cited by our dissenting colleague, either rely upon the Supreme Court's analysis of the proper scope of a vehicular search in New York v. Belton, 453 U.S. 454 (1981), see United States v. Palumbo, 735 F.2d 1095, 1096-97 (8th Cir. 1984) and United States v. Queen, 847 F.2d 346, 352-54 (7th Cir. 1988), 22 or directly involve vehicle searches, see United States v. Cotton, 751 F.2d 1146, 1147-48 (10th Cir. 1985); and Virgin Islands v. Rasool, 657 F.2d 582, 585, 588-89 (3rd Cir. 1981). As we shall discuss, vehicle searches are not analogous to the search here, and we will take this opportunity to clarify the difference between the two situations.

---

21. As we shall see, circumstances surrounding Myers' search present just such an "objective basis."

22. The court in Queen cites numerous cases that address the issue of whether a search was properly limited to the area of the arrestee's immediate control, including Lyons. See Queen , 847 F.2d at 354. The other cases cited in Queen concern vehicular searches (including Belton),

as well as several non-vehicular searches, and the Queen court does not distinguish between those two situations.

The Supreme Court addressed the scope of a vehicular search in New York v. Belton, supra. There, a state trooper stopped a speeding car for a traffic citation. Upon approaching the car, the officer noticed four male occupants and also smelled the odor of burnt marijuana. The officer also saw an envelope marked "Supergold" -- which he associated with marijuana -- on the floor of the car. Belton, 453 U.S. at 456. He therefore ordered all of the men out of the car and patted each one down after separating them into four separate areas on the highway. He then returned to their car, retrieved the envelope marked "Supergold," and discovered that it contained marijuana. He gave each of the arrestees the warnings required under Miranda v. Arizona, 384 U.S. 436 (1966), and then searched the passenger compartment of the car. The search revealed a black leather jacket belonging to Belton on the back seat. The officer unzipped one of the pockets and discovered cocaine inside. Id.

Belton moved to suppress that evidence arguing that it was the fruit of an illegal search. The Supreme Court granted certiorari defining the issue as follows:

> When the occupant of an automobile is subjected to a lawful custodial arrest, does the constitutionally permissible scope of a search incident to his arrest include the passenger compartment of the automobile in which he was riding? That is the question at issue in the present case.

Id. at 455 (emphasis added).

The Court began its analysis by restating the parameters of Terry v. Ohio and Chimel v. California, and reiterating that "the scope of [a] search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." Id. (internal quotation marks omitted). The Belton Court noted that Chimel permitted a limited search to prevent an arrestee from gaining weapons or destroying evidence, but concluded that that justification did not allow the police to routinely search an arrestee's room or "all of the desk drawers or other closed or concealed areas of that room itself." Id. at 458. (Internal quotation marks omitted). The Court observed that, although the principle derived

from Chimel and Terry was therefore quite straightforward, its application had posed difficulties. See id.

The Court noted, that despite its efforts, "no straightforward rule has emerged from the litigated cases respecting the question involved here -- the question of a

proper scope of a search of the interior of an automobile incident to a lawful custodial arrest of its occupants." Id. at 459 (emphasis added). The Belton Court declared that it intended to address these difficulties by establishing a clear set of principles to govern such searches in the context of a warrantless arrest in order to provide police officers with a set of rules which would allow them "to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement." Id. at 458 (quoting La Fave, "Case-By-Case Adjudication" versus "Standardized Procedures": The Robison Dilemma, 1974 S. Ct. Rev. 127, 142).

The Court declared:

> While the Chimel case established that a search incident to an arrest may not stray beyond the area within the immediate control of the arrestee, courts have found no workable definition of the area within the immediate control of the arrestee when that area arguably includes the interior of an automobile and the arrestee is its recent occupant. Our reading of the cases suggests the generalization that articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within the area into which an arrestee might reach in order to grab a weapon or evidentiary ite[m]. In order to establish a workable rule this category of cases requires, we read Chimel's definition of the limits of the area that may be searched in light of that generalization. Accordingly, we hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.

Belton, 453 U.S. at 460 (brackets and emphasis in original) (note and internal quotation marks omitted). In a further

28

attempt to clarify that it was only applying the rule of Chimel to the unique circumstances of a post-arrest warrantless search of an automobile, the Court stated, "our holding today does no more than determine the meaning of Chimel's principles in this particular and problematic context. It in no way alters the fundamental principles established in the Chimel case regarding the basic scope of searches incident to lawful custodial arrest." Id. at 460 n.3.

In applying its analysis to the facts before it, the Court concluded that since the search of Belton's jacket "followed immediately" after the arrest, and since the jacket "was located inside the passenger compartment of the car . . . the jacket was thus within the reach of the area which we have concluded was 'within the arrestee's immediate control' within the meaning of the Chimel case.' " Id. at 462. Accordingly, the Court held that the seizure was lawful.

We applied Belton in Rasool, supra. There, the police also stopped an automobile. They then removed the defendant from the car and handcuffed him. After the defendant was handcuffed, the police searched the inside of the car and found a bag on the back seat which they removed and searched. Inside, they found a gun. The district court suppressed that evidence, but we later reversed. [23] We defined the issue pertaining to the seizure as follows: "whether the police had probable cause to search the vehicle as distinct from any container found within[it]." Rasool, 657 F.2d at 585. We ultimately held that the police had probable cause for the search.

We found in Rasool that the Belton court had been careful to note that its holding merely applied the teachings of Chimel to the special circumstances presented by an automobile search. See id. at 587, citing Belton, 453 U.S. at 460. We emphasized that the Court characterized its holding in Belton as "doing no more than determin(ing) the meaning of Chimel's principles in this particular and problematic content. It in no way alters the fundamental principles established in . . . Chimel . . . ." Rasool, 657 F.2d at 588 (emphasis added), quoting Belton, 453 U.S. at 460 n.3.

_____

23. The district court ruled before the Supreme Court decided Belton.

Thus, as Judge Wellford points out in his dissent in Davis v. Robbs, 794 F.2d 1129 (6th Cir. 1986), "Belton was a case concerning the application of the search incident to arrest exception to the search of an automobile." Davis, 794 F.2d at 1132 n.2 (Wellford, J., dissenting). It does not apply in the context of a search inside of a private home where "Fourth Amendment rights are preeminent. . . ." Id. at 1132. The majority in Davis did affirm a search incident to arrest although the arrestee was handcuffed and placed in a squad car prior to the seizure of a rifle in his house. However, it is clear that the Davis majority strayed beyond the parameters that the Supreme Court tried to erect in Belton. We are neither persuaded by the majority's analysis in Davis nor bound by its holding.

In United States v. Cotton, 751 F.2d 1146 (10th Cir. 1985), a car was searched even though the arrestees had been handcuffed and removed from the car prior to the search. However, since Cotton involved an automobile, it was therefore governed by the special rules which the Supreme Court set forth in Belton. The court in Cotton was careful to note that important consideration. The court stated:

> We therefore believe that a legal analysis of a seizure of an object found within an automobile pursuant to a search incident to a lawful arrest, must of necessity involve special considerations that set it apart from the general law regarding searches incident to lawful

arrest.

Cotton, 751 F.2d at 1148. The court made that statement after citing Chimel and Belton and noting that Belton was a case "in which a search incident to arrest involving automobiles was directly at issue." Id. at 1148.

The Dissent points to United States v. Silva, 745 F.2d 840 (4th Cir. 1984), a non-vehicular case. See Dissent at 55. There, the Court of Appeals for the Fourth Circuit did uphold the seizure of a zippered bag although the arrestee -- who was handcuffed behind his back -- was sitting on a bed in a motel room surrounded by armed FBI agents. The court explained its reasoning as follows: "we are of the opinion that any objections Silva may have to the validity of

this search and seizure are disposed of by this court's recent en banc opinions in United States v. Litman, 739 F.2d 137 (4th Cir. 1984) and United States v. Porter, 738 F.2d 622 (4th Cir. 1984)." Silva, 745 F.2d at 847. The court noted that those cases relied upon Belton in holding that a lawful custodial arrest was sufficient to justify a contemporaneous warrantless search of the person arrested as well as the "immediately surrounding area[.]" Id. Since there was "no dispute that the zippered bag [that was seized from Silva] was in the immediately surrounding area and that it was searched contemporaneously with the arrest," the court concluded that the trial court did not err in denying the motion to suppress. Id. The Silva court never discussed whether the arresting officers actually believed that the bag was accessible or under the arrestee's control. It merely relied upon a mechanical application of the rule in Belton, even though that rule did not apply to the situation before it. Moreover, the authority relied upon -- Litman and Porter -- do not make the analysis in Silva any more persuasive.

In Litman, the court upheld the seizure of a shoulder bag from the arrestee in a hotel room. However, at the time of the seizure, the arrestee was not handcuffed. The arresting officers had pointed their weapons at him while he was being frisked, but one of the agents then holstered his pistol and searched the arrestee's bags. See Litman, 739 F.2d at 137. Therefore, the situation in Litman  was different as the arrestee there was not physically restrained. Myers was physically restrained and incapacitated. Further, the Litman court concluded that Belton controlled its analysis without even acknowledging that Belton was an automobile search. The Litman court therefore read far more into Belton than the Supreme Court intended. In doing so, it ignored the language of the very precedent it sought to apply.

In Porter, supra, the court affirmed the denial of a motion to suppress a carry-on bag that had been seized "incident to an arrest" at an airport. The court relied upon Belton and declared that the Supreme Court had there "established a

'bright-line' rule that a lawful custodial arrest justifies a contemporaneous search without a warrant of the person

arrested in the immediately surrounding area." Porter, 738 F.2d at 627 (citations omitted), citing Belton , 453 U.S. at 463 (Brennan, J., dissenting). Again, the court never even mentioned the narrowing language in Belton, nor the Court's attempt to limit its holding there to the problematic area of applying Chimel to car searches incident to the arrest of an occupant of the car.

United States v. Palumbo, 735 F.2d 1095 (8th Cir. 1984), is no more persuasive. See Dissent at 55. There, the Eighth Circuit affirmed the district court's denial of the defendant's motion to suppress evidence seized during a search that followed a warrantless arrest in a hotel room. That evidence was "hidden behind a dresser drawer . . . ." Palumbo, 735 F.2d at 1097. The defendant argued that it was therefore "inaccessible to him because he was handcuffed in the presence of several officers." Id.

However, it was not at all clear that the defendant was as incapacitated as he argued. The Court of Appeals noted that the arresting officer's testimony at the suppression hearing "indicates that [the arrestee] was not handcuffed when the officers retrieved the cocaine behind the drawer within an arm's reach from where Palumbo sat." Id. at 1097. The court then ventured further stating: "accessibility, as a practical matter, is not the benchmark." Id. Rather, the court concluded that the issue was whether the seized item "was in the area within the immediate control of the arrestee within the meaning of Chimel v. California." Id. The court cited Belton and explained that "[t]his rule defines the area generally which may be searched, and is not constrained because the arrestee is unlikely at the time of the arrest to actually reach into that area." Id., citing Belton, 453 U.S. at 459-60. However, the court's citation to Belton refers to the portion of Belton wherein the Court was attempting to apply the general rule of Chimel to the specific circumstance of an automobile search. Belton has no application to Palumbo's hotel room nor to the residence in which Myers was searched.

Finally, United States v. Queen, 847 F.2d 346 (7th Cir. 1988), cites numerous cases in upholding a search incident to an arrest where the arrestee was also handcuffed behind his back inside of a residence. See Dissent at 55. There

again, however, authority is cited by the court with no discussion of the distinction between those cases involving seizures from vehicles on the one hand,24  and non-vehicular searches on the other.25 See Queen, 847 F.2d at 354.

The court's discussion in Queen is, however, helpful to

resolving some of the inconsistencies that have evolved in applying the rule of Chimel beyond the vehicular context described in Belton. In Queen, agents had a warrant for the defendant's arrest. They knew that he was a convicted felon who had not surrendered pursuant to a court order. The police also suspected that Queen was armed and dangerous. The police executed the warrant at his residence after surrounding it. They searched the house where an agent observed a pile of clothes and a blanket in an open closet. Suspecting Queen to be hiding underneath, the agent immediately drew his gun and ordered Queen to come out with his hands up. After initially refusing to comply with the order, Queen finally emerged from beneath the pile. The agents patted him down while keeping their guns trained on him. They then handcuffed him in an area

---

24. New York v. Belton, 453 U.S. 454 (1981); United States v. Hatfield, 815 F.2d 1068, 1071 (6th Cir. 1987); Davis v. Robbs, 794 F.2d 1129 (6th Cir. 1986); United States v. Cotton, 751 F.2d 1146 (10th Cir. 1985); Virgin Islands v. Rasool, 657 F.2d 582 (3d Cir. 1981).

25. United States v. Palumbo, 735 F.2d 1095 (8th Cir. 1984); United States v. Roper, 681 F.2d 1354 (11th Cir. 1982); United States v. Fleming, 677 F.2d 602 (7th Cir. 1982); United States v. Garcia, 605 F.2d 349, 352 (7th Cir. 1979). Fleming is an anomaly. That case involved a search of luggage incident to a warrantless arrest at an airport. The police had reliable information (much of which was independently confirmed) that the arrestee would be arriving with heroin. Police watched the arrestee as she claimed her luggage from the baggage area. She dropped her luggage when the police approached and identified themselves. She then became hysterical, and exclaimed, " 'I knew I shouldn't have done this,' and proceeded to urinate on her clothing." 605 F.2d at 352. Officers then retrieved the luggage from the airport doorway where she had dropped it, and actually brought it to"within one foot of [the arrestee's] new position" before opening the bags. She "was not handcuffed or otherwise restrained during this time." Id. Fleming distinguished that situation from the situation in United States v. Chadwick, 433 U.S. 1 (1977), and ruled that the search was reasonable under Chimel.

that was approximately three feet from the open closet where he had been hiding. See id. at 349. After he was handcuffed, one of the agents inspected the area around the blanket and found an uncovered .357 magnum revolver which was loaded with six bullets. See id. at 350.

Queen moved to suppress the fruits of that search contending that it exceeded the permissible scope of Chimel. He argued that "it was inconceivable that, with his hands cuffed behind his back, he could have twisted away from two armed agents and dived past a third to grab the handgun lying on the closet floor." Id. at 353. The government responded by arguing that the agents "reasonably believed that any weapon on the floor of the closet was within the grabbing range of Mr. Queen. .. . [and that] policemen do not need to presume, that, in a

stressful situation like the arrest here, the defendant will act in a wholly rational manner." Id. The court accepted the government's argument noting that, although Queen was "neither an acrobat [nor] a Houdini[,]" the nature of the circumstances that the officers were facing counseled against requiring "punctilious judgments regarding what is within and what is just beyond the arrestee's grasp. Thus, searches have sometimes been upheld even when hindsight might suggest that the likelihood of the defendant reaching area in question was slight." Id. (internal citations and quotations omitted).

This concern over using "hindsight" to punctiliously overrule an officer's split-second judgment explains courts' justifiable reluctance to suppress a weapon where the objective circumstances suggest that the officer's actions at the time of the arrest reflect the officer's belief that an arrestee may gain access to the weapon. As the Supreme Court noted in United States v. Chadwick, 433 U.S. 1 (1977):

> The potential dangers lurking in all custodial arrests make warrantless searches of items within the immediate control area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved.

Chadwick, 433 U.S. at 14-15 (internal quotation omitted).

Thus, where, in the heat of an arrest, an officer concludes that a particular item is within the arrestee's grasp, courts are extremely reluctant to subsequently determine that the officer's conclusion was unreasonable and thereby suppress whatever evidence may have been found. This explains the result in Queen and further explains why the court in Abdul-Saboor stated that it would uphold such seizures as being incident to arrest under Chimel, "absent some objective basis [to conclude] that the arresting officer had no reason to fear either the arrestee or the environment in which the arrest unfolded." Abdul-Saboor, 85 F.2d at 670 (emphasis added).26

Of course here, Officer Azzarano's actions provide just such an "objective basis" to conclude that he was not concerned with Myers reaching into the bag. Officer Azzarano handcuffed Myers' hands behind his back while Myers was face-down on the floor. The officer then immediately conducted a brief search that included "frisking" Myers' waistband.27 See App. at 72a. However, Azzarano then left Myers and went downstairs to speak with Bennett. During that interval, Myers remained "covered" by two backup officers who arrived immediately after Azzarano had arrested and handcuffed Myers. The bag was approximately three feet away from Myers and zipped closed. Obviously, if the officer had been worried at the time of the arrest that Myers could reach the black bag though handcuffed and covered by two police officers, he would

have searched the black bag when he searched Myers'
waistband. Instead, he felt secure enough to leave Myers
and go downstairs to speak with Bennett. Indeed, Azzarano
did not state that he opened the bag because he was
concerned that Myers had access to it. He testified that he

_____

26. In explaining the inconsistent application of Chimel, we do not mean
to suggest that a reviewing court must be bound by the officer's on-the-
scene conclusion about the necessity of a search regardless of the
environment where the arrest occurs or the extent to which an arrestee
is actually incapacitated and under police control.

27. As noted earlier, the arrest was effectuated when Myers was ordered
to the ground at gunpoint and handcuffed. If the arrest had been valid,
the initial frisk of Myers' waistband could clearly be characterized as a
search incident to an arrest under Chimel.

was concerned about possibly leaving a weapon behind in
a home with Bennett and her minor child. This is a far cry
from Chimel's license to search for a weapon that could be
used to effectuate an escape, injure the arresting officer(s)
or destroy evidence. Had he searched the bag along with
the waistband before going downstairs, we would have a
different set of circumstances to consider against the
teachings of Chimel and its progeny. However, he did go
downstairs and his explanation for seizing the bag leaves
us confident that the seizure was not "reasonable" within
the meaning of the Fourth Amendment because it was not
incident to Myers' arrest.

We agree with the district court's conclusion that the bag
was "within [Myers'] immediate control and possession
when Azzarano first observed him." App. at 171a (emphasis
added). The district court also stated that "at this moment
[referring to when Azzarano first saw Myers], Azzarano still
felt that someone else could be in the home and his
primary purpose and concern was to obtain the weapon
and to get it out of the house where Bennett and the
children lived." Id. (emphasis added).

That is when Myers was arrested, and that is when
Myers' waistband was searched. However, that is not when
the bag was searched. The search of the bag came
sometime later, after Azzarano left Myers and went
downstairs, leaving Myers restrained, physically
incapacitated, and under the control of two armed police
officers.

Moreover, the district court's analysis conflates two
separate and independent justifications for searching
incident to an arrest. In addition to conducting a search for
the protection of the officer or to prevent the destruction of
evidence, the police may also conduct a protective"sweep"
under certain circumstances when they fear an accomplice
may be lurking nearby. See Sharrar v. Felsing , 128 F.3d
810 (3d Cir. 1997). Nothing on this record suggests that

Azzarano was concerned that any confederate was lurking about.

Moreover, Azzarano's testimony establishes that he was not initially concerned about the bag even when he went

back upstairs and returned to Myers. He did not return to search the bag. Azzarano testified: "I went back upstairs to find out what this -- what the defendant's name actually was, because he had, in fact, given a fake name." App. at 76a (emphasis added). Azzarano only decided to open the bag because Myers appeared to look at it in a manner that suggested he did not want the police to see what was inside. He stated: "[t]he defendant's demeanor led me to believe that there was something in the bag that he didn't want me to see. At that point, I opened the bag, and discovered this handgun." Id. at 77a. Moreover, since he returned to Myers to question him about his name, not to search the bag, the record establishes that Azzarano's concern for the danger the gun posed arose only after he opened the bag. Therefore, this search can not be sustained as a search incident to an arrest. See Chimel , 395 U.S. at 762-63.28

III.

Before concluding we pause to amplify a point we made at the beginning of our discussion. We briefly mentioned the constitutional imperative that we not overlook our institutional role when reviewing police conduct and applying the exclusionary rule. See Mapp v. Ohio , 367 U.S. 643 (1961). Given our colleague's concern, that point merits amplification. We are, of course, mindful of the exceedingly difficult nature of the split-second decisions police officers must make on a daily basis. The Dissent scoldingly cautions against "[a]ppellate judges [who] spend their days cloistered in secure buildings guarded by United States Marshals, protected from strangers and the public by electronically controlled doors and elevators[,]" reviewing

_____

28. The Dissent notes that "Ms. Bennett's residence was not searched. No property of hers was seized. She was not arrested or charged with any crime." Dissent at 44. That is, of course, irrelevant. Myers clearly had a reasonable expectation of privacy while in Bennett's home and neither the Government, nor the district court suggests otherwise. See Minnesota v. Olson, 495 U.S. 91 (1990). Accordingly the fact that his property rather than his host's was seized is as irrelevant as the fact that he was in someone else's home when his own reasonable expectation of privacy was violated and he was seized.

arrest decisions of trained police officers. Dissent at 53. As our dissenting colleague reminds us, "[w]e have no expertise in the investigation of volatile domestic

altercations. We have no first-hand experience regarding the threat of violence presented by persons involved in a domestic dispute when a police officer attempts to act as a peacemaker in calming their fury." Id.

Although such sentiments have a great deal of popular appeal, we must never allow our lack of police training to seduce us into abdicating our judicial function for the sake of preserving evidence of criminal activity. It is obvious that police officers do not enjoy the secure and contemplative atmosphere afforded judges, and judges do not patrol city streets. It is just as obvious that judges are not trained in policing. Nevertheless, the Constitution mandates that the ultimate determination of the legality of an arrest be made by judges, not by police officers.

Though a concerned public may not always appreciate it, the Supreme Court has explained that it can hardly be otherwise under the Constitution: "If subjective good faith [of the arresting officer] alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, . . . and effects, only in the discretion of the police." Beck , 379 U.S. at 97 (internal quotation marks omitted). "[T]here is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." Arizona v. Hicks, 480 U.S. 321, 329. Thus, our respect for, and appreciation of, the difficulties and dangers of law enforcement do not justify surrendering our constitutional duties to police officers.

More than half a century ago, the Supreme Court warned:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

38

Johnson v. United States, 333 U.S. 10, 13-14 (1948).

Despite the understandable concerns voiced in dissent by our esteemed and distinguished colleague, we do not believe that we can uphold this arrest or search without doing violence to the Fourth Amendment guarantees that we are sworn to uphold. As we stated in Fisher , "effective law enforcement . . . can only be maintained by a respect for the law." 496 U.S. at 342.

IV. Conclusion

For all the reasons set forth above, we conclude that the district court erred in denying the defendant's motion to

suppress physical evidence. Therefore, we will reverse the order of the district court denying the motion to suppress and remand for further proceedings consistent with this opinion.29

_____

29. Myers also argues that 18 U.S.C. S 922(g)(1) is unconstitutional as it improperly proscribes purely intrastate possession of a firearm and therefore lacks the requisite nexus to interstate commerce. However, that argument is clearly foreclosed by our holding in United States v. Singletary, 268 F.3d 196 (3d Cir. 2001), and we therefore reject it without discussion.

ALARCON, Senior Circuit Judge, Dissenting:

I respectfully dissent. I cannot join the Majority's opinion for several reasons:

First. The Majority has failed to discuss the dispositive issue raised by Myers in this appeal: Whether "the warrantless entry to 3203-B Henry Avenue was conducted without probable cause to believe a crime had been committed and without exigent circumstances." (emphasis added). Instead, the Majority states summarily:"Although we conclude that Officer Azzarano's initial entry into the residence was justified, we hold there was no probable cause to arrest Myers." Maj. Op. at 5. As I will explain later, this conclusion ignores recent Supreme Court authority and is inconsistent with the law of this circuit which holds that a warrantless entry violates the Fourth Amendment unless the police have probable cause even in the presence of exigent circumstances.

Second. I would affirm the district court's opinion because the record shows that, prior to entering, Officer Azzarano had probable cause to believe that a person within the residence was armed with a weapon and fighting with a resident.

Third. Exigent circumstances justified the warrantless entry to protect Ms. Bennett from death or serious injury from a man armed with a gun.

Fourth. The record demonstrates that the search of Myers's backpack was incident to a lawful arrest.

I

In reviewing a district court's findings of historical facts, we must "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699 (1996). We must also construe the record in the light most favorable to the Government. United States v. Lawes, 292 F.3d 123, 126 (2d Cir. 2002); United States v. Runyan, 290 F.3d 223, 234 (5th Cir. 2002); United States v. Cook, 277 F.3d 82, 84 (1st Cir. 2002).

The "totality of the circumstances" informs a probable cause determination. Illinois v. Gates, 462 U.S. 213, 230-31 (1983). In evaluating the totality of the circumstances in a given case, a court may not consider each fact in isolation. United States v. Arvizu, 534 U.S. 266, 122 S. Ct. 744, 750-51 (2002). In United States v. Arvizu, the Court rejected the Ninth Circuit's "divide and conquer analysis" that considered each circumstance separately to determine whether it was susceptible of an innocent explanation. Id. at 751.

The Majority has concluded, in alternative analyses, that Officer Azzarano did not have probable cause to arrest Myers, and "even if we assume arguendo that the arrest was lawful, we would still find that the gun should have been suppressed as the subsequent search was not incident to the arrest." Maj. Op. at 23. Clearly, at least one of these conflicting conclusions, if not the entire Majority opinion, is dictum.1

My review of the record has persuaded me that the district court did not clearly err in concluding that Officer Azzarano was aware of "reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that [Myers] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964). Because the reasonably trustworthy information obtained by Officer Azzarano from Diane McKnight was sufficient to warrant him to believe that an armed man was presently threatening the safety of his victim, the officer's entry into the residence was supported by probable cause and exigent circumstances. His observations within the residence corroborated the information that he received from Ms. McKnight. The record also demonstrates that the district court did not err in

---

1. "Indeed, any time the Court relies on alternative reasoning, both analyses are not necessary to the decision of the case, and are therefore dicta. Thus, by adding additional reasons for its decision, the Court is effectively undermining what precedential value the opinion may have." Matthew F. Weil & William C. Rooklidge, Stare Un-Decisis: The Sometimes Rough Treatment of Precedent in Federal Circuit Decision-Making, 80 J. Pat. & Trademark Off. Soc'y 791, 795 (1998) (emphasis added) (internal quotation marks and citation omitted).

concluding that the search of Myers's backpack was incident to a lawful arrest.

II

Viewed in the light most favorable to the Government, the record demonstrates that Officer Azzarano received a radio dispatch that "a person with a gun" was involved in "a disturbance with a female companion" at 3202 Henry

Avenue, Apartment B. When he received the assignment to go to that location, Officer Azzarano was a block and a half or two blocks away. He was so close to the scene that he did not have to activate his emergency lights and siren. At 3202 Henry Avenue, Officer Azzarano observed an adolescent female, Diane McKnight, standing approximately two feet outside the doorway to Apartment B. Ms. McKnight was the source of the 911 call. She is the daughter of the female inside the apartment. She is the oldest of six children. Ms. McKnight appeared to be frightened.

Ms. McKnight informed Officer Azzarano that "her mom and her mom's boyfriend were in the house arguing and having a fight and that her mom's boyfriend was armed with a gun." Ms. McKnight's statement and her distraught demeanor provided Officer Azzarano with reliable information that her mother's boyfriend was threatening her safety while armed with a gun. "[W]here an informant is not a paid, unknown tipster but instead an identified eyewitness to a crime who voluntarily reports his observations to the police, the trustworthiness of such a person may be presumed." Commonwealth v. Weidenmoyer, 539 A. 2d 1295 (Pa. 1988). See also United States v. Valentine, 232 F.3d 350, 354-55 (3d Cir. 2001) (discussing informant reliability). Based on this information alone, an officer would reasonably believe that Ms. McKnight's mother was facing a threat of serious bodily injury. Thus, probable cause existed to arrest Myers before Officer Azzarano crossed the threshold.

Myers contends that "the warrantless entry of 3202-B Henry Avenue was conducted without probable cause to believe a crime had been committed and without exigent circumstances. Therefore, everything that followed-- the

42

arrest and subsequent seizure of the gun -- were unlawful, and the gun should have been suppressed for this reason, without more." The Majority has failed to address this dispositive contention. It has failed to consider whether Ms. McKnight's information was sufficient to cause Officer Azzarano reasonably to believe that her mother was threatened with an assault by an armed man. The Majority has also failed to respond to Myers's contention that an insufficient showing of exigent circumstances was made that compelled an entry to save lives.

"[P]robable cause is an indispensable element for a warrantless search of a dwelling even in the presence of exigent circumstances." Fisher v. Volz, 496 F.2d 333, 339 (3d Cir. 1974) (internal quotation marks omitted). Ms. McKnight's report that a man armed with a gun was involved in a fight with her mother was sufficient to warrant a person of reasonable caution to conclude that an offense that threatened the life of Ms. McKnight's mother and endangered the safety of her five brothers and sisters was on-going. Her information provided Officer Azzarano with probable cause to enter and arrest Myers without a

warrant.

The Majority has concluded that "Officer Azzarano's initial entry into the residence was justified." Maj. Op. at 5. The Majority has also determined, however, that "there was no probable cause to arrest Myers." Id. The Majority has not explained how Officer Azzarano's warrantless entry can be "justified" if he did not have probable cause to arrest Myers. Without probable cause to arrest Myers, Officer Arrazano's warrantless entry in the residence would not be justified under the Fourth Amendment pursuant to Kirk v. Louisiana, 536 U.S. ___, 122 S. Ct. 2458, 2459(2002) (per curiam), and Fisher v. Volz, 496 F.2d at 339.2 I know of no

---

2. In footnote 19, the Majority relies on Sheik-Abdi v. McClellan, 37 F.3d 1240 (7th Cir. 1994) in support of its finding that Azzarano did not have probable cause to arrest while conceding that his entry was "justified." The Majority states that "[t]he court in Sheik-Abdi distinguished between exigent circumstances that would justify a warrantless entry into a home, and probable cause needed for arrest." Maj. Op. at p. 22, n.19. The Majority's reliance on Sheik-Abdi is misplaced. The Sheik-Abdi

43

case that holds that the probable cause to make an arrest that is necessary to justify a warrantless entry disappears as soon as an officer steps into the residence. The Majority has cited none. If, as the Majority appears to have concluded, Officer Azzarano did not have probable cause to believe a crime was being committed prior to his entry into the apartment, it would be our duty to reverse the denial of the motion to suppress the seizure of the gun "for that reason, without more," as requested by Myers.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. Evidence seized as the result of an unreasonable search and seizure must be suppressed. Mapp v. Ohio, 367 U.S. 643, 654-55 (1961).

In this matter, the narrow question we must decide is whether the warrantless arrest of Myers in Ms. Bennett's residence, and the search of his person conducted as an incident thereto, were unreasonable under the Fourth Amendment. Ms. Bennett's residence was not searched. No property of hers was seized. She was not arrested or charged with any crime.

In Payton v. New York, 445 U.S. 573 (1980), the Supreme Court held that a New York statute that authorized the warrantless and nonconsensual entry of a private residence to make an arrest based on probable cause to believe a felony had been committed was unconstitutional. Id. at 576. The Court stated that it would not reach the question whether a warrantless entry to effect an arrest based on

decision does not involve the validity of a warrantless entry based on exigent circumstances. The Seventh Circuit noted that "Sheik-Abdi does not challenge the lawfulness of the officers' presence in his home." Id. at 1245. In fact, Sheik-Abdi "concede[d] that while in the home, the officers presumably could have prevented any breach of the peace that occurred or as likely to occur." Id. The Seventh Circuit's decision in Sheik-Abdi does not support the Majority's finding that a warrantless entry can be "justified" without probable cause and exigent circumstances, as required by the Supreme Court in Kirk v. Louisiana and this circuit's decision in Fisher v. Volz.

probable cause is reasonable if accompanied by exigent circumstances because "none of the New York courts relied on such justification." Id. at 582-83. The Court commented: "Accordingly, we have no occasion to consider the sort of emergency or dangerous situation described in our cases as 'exigent circumstances' that would justify a warrantless entry into a home for the purpose of either arrest or search." Id. at 583. In a later passage, the Court stated:

> "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not be crossed without a warrant." Id. at 590.

More recently, in Kirk v. Louisiana, the Court paraphrased its holding in Payton v. New York as follows: "As Payton makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." Id. at 2459. (Emphasis added). Because the Majority appears to have concluded that Officer Azzarano did not have probable cause to cross the entrance to Ms. Bennett's residence, its conclusion that the entry was justified violates the Supreme Court's decisions in Payton v. New York and Kirk v. Louisiana.

The Majority's discussion of Steagald v. United States, 451 U.S. 204 (1981) in footnote 9 of its opinion to refute my reliance on Kirk v. Louisiana and this court's decision in Fisher v. Volz is puzzling. Steagald involves a completely distinguishable factual scenario and legal analysis. The Supreme Court summarized the question presented to it in Steagald v. United States in the following words: "[T]he narrow issue before us is whether an arrest warrant-- as opposed to a search warrant -- is adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances." Id. at 212. The Court held that "warrantless searches of a home are impermissible absent consent or exigent circumstances." Id. at 216. (Emphasis added).

In Steagald, police officers entered Steagald's residence without a search warrant, consent, or exigent

circumstances to serve an arrest warrant on Ricky Lyons. Lyons was not in Steagald's residence. Nevertheless, the officers proceeded to conduct a search of Steagald's residence. They discovered controlled substances. Steagald was arrested and indicted on federal charges. Steagald moved to suppress the evidence seized in his home on the ground that the officer did not have a search warrant when they entered his residence. Id. at 207-08. The Supreme Court noted in Steagald that "the Fourth Amendment claim here is not being raised by Lyons. Instead, the challenge to the search is asserted by a person not named in the warrant who was convicted on the basis of evidence uncovered during a search of the residence for Ricky Lyons." Id. at 212. (Emphasis added.) The Court reversed the Fifth Circuit's judgment in Steagald holding that the fact that the officers had a warrant for the arrest did not justify the search of Steagald's residence. Id. at 205. The Supreme Court concluded in Steagald that, absent consent or exigent circumstances, the police cannot conduct a warrantless search of a residence in order to seize the homeowner's property. Id. at 216. Here, the police did not conduct a search of Ms. Bennett's residence nor did they seize property belonging to her. Thus, Steagald has no relevance to the issues presented in this case.

I agree with the Majority's conclusion that Officer Azzarano's entry was "justified" but on totally discrete grounds. Officer Azzarano's undisputed testimony demonstrates that he received information from a credible informant that exigent circumstances compelled a warrantless entry because an armed man was fighting with the informant's mother. This information also was sufficient to demonstrate that there was probable cause to arrest Myers for the commission of a serious crime.

I also agree with the district court that failure to enter the residence and arrest Myers under these circumstances would have been a grave dereliction of Officer Azzarano's duty to protect the safety of his fellow citizens. The record, viewed in the light most favorable to the Government, demonstrates that Officer Azzarano had probable cause to believe a serious crime was being committed and that exigent circumstances required an immediate entry based on Ms. McKnight's report.

III

When Officer Azzarano entered the apartment, he heard raised voices and a lot of movement which he characterized as "what appeared to be some type of fight occurring on the second floor." Officer Azzarano called out "police." He did not receive a response. At the top of the stairs, Officer Azzarano encountered Lydia Bennett. He testified that she "seemed upset to me and seemed that she had just been

involved in some type of altercation." He further testified that her "demeanor seemed to be consistent with someone who had been involved in some type of dispute. Her voice was shaky, she seemed upset."

Officer Azzarano asked Ms. Bennett where the person was who had been upstairs with her. She replied there was no one upstairs with her. Based on Officer Azzarano's police experience in responding to domestic-dispute calls, her response suggested to him that "she had, in fact, been involved in some type of dispute and there was someone nearby." Officer Azzarano was aware that Ms. Bennett's statement that she had been alone was not true because he had heard at least two voices, and more than one set of footsteps. He inferred from her false response that she was afraid that Myers would retaliate if she complained of his conduct.

As of the date of the suppression hearing, Officer Azzarano had been a member of the Philadelphia Police Department for three years. During that time, he had responded to at least one domestic disturbance call a day. He testified that such calls are very dangerous because the anger level of the persons engaged in the altercation is elevated and "lots of times you don't exactly know what you're walking into." In United States v. Arvizu, the Supreme Court instructed that the totality of the circumstances standard "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." 122 S. Ct. at 750-51 (internal quotation marks omitted). Thus, it was reasonable, based on his experience in investigating domestic violence, for Officer Azzarano to infer from her distraught condition, and her denial that

47

anyone was upstairs with her, that she feared that revealing where Myers was hiding might endanger her safety.

Officer Azzarano's own observations corroborated Ms. McKnight's information that her mother was involved in an altercation with an armed man. After receiving Ms. Bennett's deceptive reply, Officer Azzarano saw Myers hiding behind a partially open bedroom door. The fact that the person behind the door was attempting to avoid detection caused Officer Azzarano to conclude that there was no reason for Myers "to hide from me if, in fact, it was just a simple argument between two parties." 3 Thus, based on Ms. McKnight's request for police intervention to protect her mother from a man with a gun, and his independent observations, Officer Azzarano aimed his gun at Myers and ordered him to step out from behind the door. When Myers stepped out, he was carrying a black backpack. Officer Azzarano ordered Myers to lie down on the floor. Myers complied and while doing so, placed the backpack on the floor approximately three feet away from his body. Officer

Azzarano handcuffed Myer's hands behind his back and placed him under arrest for domestic assault. Officer Azzarano defined the Pennsylvania crime of domestic assault as "assault or some type of threat level towards someone who [Myers] had a previous relationship with." Officer Azzarano checked Myers's waistband to see if he was carrying a concealed weapon. Myers was not carrying a weapon on his person.

IV

In a well-reasoned discussion of the pertinent facts and the applicable legal principles, the district court held that Officer Azzarano had probable cause to believe that a domestic disturbance was in progress involving a man armed with a gun and that these exigent circumstances justified a warrantless entry of the residence. I am persuaded that each of the district court's factual findings

_____

3. Nor were Myers and Bennett "in the middle of a peaceful dinner, sharing jokes and laughing." See Maj. Op. at 21 n.17.

is supported by evidence in the record and that it did not commit any legal errors.

A.

The district court determined that Officer Azzarano had probable cause to arrest Myers for the crime of simple assault pursuant to 18 Pa. C.S. S 2701(a)(3) (2000). Section 2701(a)(3) provides that "a person is guilty of assault if he . . . attempts by physical menace to put another in fear of imminent serious bodily injury." At the time of Myers's arrest, a police officer had the right to arrest a person for simple assault that did not take place in the presence of the police officer if "he has probable cause to believe that the defendant has violated section . . . 2701 (relating to simple assault) . . . against his spouse or other person with whom he resides or has formerly resided." 18 Pa. C.S. S 2711(a) (2000). An officer may not arrest a person under section 2711 "without first observing recent physical injury to the victim or other corroborative evidence ." 18 Pa. C.S. S 2711(a) (2000) (emphasis added). It is quite true that Officer Azzarano did not see Myers assault Ms. Bennett, nor did he observe recent physical injury. The record, however, is replete with corroborative evidence known to Officer Azzarano that would support an inference that Myers "attempt[ed] by physical menace to put[Ms. Bennett] in fear of imminent serious bodily injury." 18 Pa. C.S. S 2701(a)(3).

As summarized above, before arresting Myers, Officer Azzarano was aware of the following circumstances:

1. The Philadelphia Police Department had received a 911 telephone call that a person with a gun was involved in

a disturbance with a female companion.

2. Officer Azzarano was told by Ms. McKnight that her mother and her boyfriend were involved in a fight and the boyfriend was armed with a gun.

3. Officer Azzarano heard what sounded like a fight on the second floor.

4. When Officer Azzarano observed Ms. Bennett, she appeared to be upset as if she had been involved in an altercation.

5. When asked about the whereabouts of the other participant in the dispute, Ms. Bennett falsely represented she had been alone.

6. Based on his prior experience in investigating domestic disputes, Officer Azzarano inferred from her false response that she was afraid to respond truthfully because she was afraid of violent retribution.

7. Myers did not respond when Officer Azzarano announced his presence as a police officer, and instead hid behind a partially open bedroom door.

8. Myers was holding a backpack just prior to being placed under arrest.

The totality of these circumstances provided corroborative evidence that Myers had attempted to place Ms. Bennett in fear of bodily injury.

In rejecting the district court's findings, the Majority has made its own credibility findings, reweighed the evidence, and failed to consider the record in the light most favorable to the Government, in contravention of clearly established principles of appellate review. See United States v. Igbonwa, 120 F.3d 437, 440-41 (3d Cir. 1997). The Majority also appears to have confused the quantum of evidence required to demonstrate probable cause for an arrest with the heavy burden placed on the Government to present sufficient evidence of each element of a crime that persuades the trier of fact of the guilt of the defendant beyond a reasonable doubt. Draper v. United States, 358 U.S. 307, 312 (1959).

B.

The district court's findings concerning the circumstances that demonstrated probable cause for an arrest for simple assault under Pennsylvania law read as follows:

> Now, with reference to the arrest and the information that the officer had available to him at that time, Pennsylvania Statute defines an assault as-- among other things, as an attempt to cause or intentionally,

knowingly or recklessly causing bodily injury to

50

> another and also includes attempts by physical menace
> to put another in fear of serious bodily injury.
>
> In this regard, I find that there was an ongoing simple
> assault in the presence of Officer Azzarano and,
> therefore, conclude that he had probable cause to
> arrest for that ongoing assault at that time, since it
> was occurring in his presence. This is based on the
> totality of the circumstances that I have mentioned,
> including the 9-1-1 report, the conversation with
> McKnight, the statement that McKnight said they were
> fighting and that the boyfriend has a gun, that he
> heard the raised voices upstairs and the movement
> which suggested an ongoing fight, his conversation
> with Bennett and her denial of his presence and also
> her demeanor, and that the house was in array (sic)
> and that the defendant was hiding and she denied that
> he was there. So, I conclude, therefore, that he did
> have the probable cause to make an arrest for simple
> assault at that time.

(emphasis added).

The Majority appears to have concluded that the term
"fighting" as used by Ms. McKnight in describing the on-
going crime being committed against her mother refers
solely to a "physical altercation or struggle." Maj. Op. at 12.
The term "fight," however, includes "a verbal disagreement."
Webster's Third New International Dictionary 847 (1976). It
is undisputed that Officer Azzarano heard raised voices,
observed Ms. Bennett's distraught condition, and saw that
the upstairs area was in disarray, as if there had been a
struggle. He had also been informed by a person whose
information is presumed to be trustworthy that Myers was
armed with a gun. Officer Azzarano's independent visual
and auditory perception of these circumstances involving
an armed man would lead a reasonable person to conclude
that the information he had received from Ms. McKnight
was accurate and that there was probable cause to believe
Myers was attempting to place Ms. Bennett in fear of
imminent serious bodily injury.

The Majority has made a factual finding that the upstairs
area where Officer Azzarano encountered Ms. Bennett was

51

not in disarray. The district court's contrary finding that
the area was in disarray was based on Officer Azzarano's
undisputed testimony. The Majority states:

> "The record is devoid of any suggestion that the level of
> disarray was excessive to the point of being probative
> of a physical altercation. The most that we can

conclude from the officer's description of the state of the apartment is that it was messy." (Emphasis added.)

Maj. Op. at 13-14.

The Majority's finding that the apartment was "messy," and not in disarray, violates the rule that appellate courts cannot reweigh the evidence, or engage in fact-finding. Igbonwa, 120 F.3d at 440-41. Officer Azzarano's description of the condition of the apartment was undisputed. The Majority's finding also ignores Officer Azzarano's daily experience in investigating domestic disputes and his prior observations of the condition of residences where violations of section 2701(a)(3) had occurred.

The quoted language also ignores the fact that evidence of a physical altercation is not required to prove a violation of section 2701(a)(3). That crime is committed if a person attempts to put another in fear of imminent serious bodily injury by physical menace. 18 Pa. C.S. S 2701(a)(3). Proof of a physical injury is not required.

The Majority states that "there is no evidence that Myers pointed a gun at Bennett in Azzarano's presence or otherwise, and nothing supports the inference that Azzarano thought he had." Maj. Op. at 9. In fact, Officer Azzarano testified that he arrested Myers for "domestic assault" because of his "terrorist threats" with a handgun. The refusal of the Majority to accept Officer Azzarano's undisputed testimony concerning the inferences he drew, based on the totality of the circumstances, is contrary to our duty as appellate judges to construe the record in the light most favorable to the Government in reviewing the denial of a motion to suppress. Cook, 277 F.3d at 84.

C.

In reweighing the evidence in the record, the Majority has also minimized what Azzarano saw, finding that "the only

52

thing Myers did in [Azzarano's] presence was hide behind a door." Maj. Op. at 9. This finding is also inconsistent with Officer Azzarano's undisputed testimony. As Officer Azzarano ascended the stairway, Myers attempted to conceal himself behind a partially open doorway. The threat of imminent harm to Ms. Bennett from an armed man did not cease. It continued -- but with Officer Azzarano as an additional victim of Myers's menacing behavior. Officer Azzarano testified:

When I saw the defendant was hiding behind the door, my fear level increased greatly. I figured something had, in fact -- something happened or something was happening and there would be no reason for him to hide from me if, in fact, it was a simple argument between two parties.

(emphasis added).

Appellate judges spend their days cloistered in secure buildings guarded by United States Marshals, protected from strangers and the public by electronically controlled doors and elevators. We have no expertise in the investigation of volatile domestic altercations. We have no first-hand experience regarding the threat of violence presented by persons involved in a domestic dispute when a police officer attempts to act as a peacemaker in calming their fury. Instead of engaging in a reductio ad absurdum dissection of an officer's recitation of the totality of the circumstances confronted in making an arrest under life-threatening conditions, in clear violation of the Supreme Court's instruction in United States v. Arvizu , we should adhere to this court's admonition that "when the district court's decision is based on testimony that is coherent and plausible, not internally inconsistent and not contradicted by external evidence, there can almost never be a finding of clear error." Igbonwa, 120 F.3d at 440-41 (internal quotation marks and citations omitted). The district court did not clearly err in concluding that Officer Azzarano had probable cause to believe that Myers committed a violation of section 2701(a)(3) in the officer's presence.

V

The district court denied the motion to suppress because it was persuaded by the totality of the circumstances that Officer Azzarano had probable cause to arrest Myers and that the search of the backpack was incident to a lawful arrest. The Majority has concluded that Officer Azzarano did not have probable cause to arrest Myers for any crime.4 This observation, if correct, would invalidate the warrantless entry of the residence and eliminate the need to determine whether the search of the backpack was incident to a lawful arrest. In a discussion which lacks any precedential value because it is unnecessary to its decision, and casts doubt on its conclusion that Azzarano did not have probable cause to arrest Myers, the Majority has opined that the search of the backpack was not incident to Myers's arrest.

The Majority states that, because Myers was handcuffed behind his back and covered by two armed police officers, the backpack was not accessible to Myers because"he was neither an acrobat [nor] a Houdini" Maj. Op. at 25. (quoting United States v. Abdul-Saboor, 85 F.3d 664, 669 (D.C. Cir. 1996). The quoted language from Abdul-Saboor is dictum. In Abdul-Saboor, the D.C. Circuit affirmed the denial of a motion to suppress. Id. at 666. In that matter, the record showed that the search was conducted after the defendant was handcuffed and sitting on a chair in a hallway about four feet outside the bedroom door in the custody of at least one armed police officer. Id. at 669-70. The D.C. Circuit held in Abdul-Saboor that the subsequent search of the bedroom was a lawful search incident to an arrest. Id. at

670. Thus, Abdul-Saboor supports the conclusion of the district court here that the search of the backpack was accessible to Myers and incident to a lawful arrest, notwithstanding the fact he was handcuffed and in the custody of an officer.

_____

4. As discussed above, the Majority's holding is starkly inconsistent with its determination that the warrantless entry of the residence did not violate the Fourth Amendment because it was "justified." A warrantless entry of a dwelling must be supported by probable cause "even in the presence of exigent circumstances." Fisher v. Volz, 496 F.2d at 339 (internal quotation marks omitted).

54

Other circuits have also upheld searches conducted as an incident to an arrest where the defendant was handcuffed and in the presence of police officers. In United States v. Queen, 847 F.2d 346 (7th Cir. 1988), the Seventh Circuit affirmed the denial of a motion to suppress a loaded revolver seized from the floor of a closet as incident to an arrest although the defendant's hands were handcuffed behind his back and he was guarded by two armed Federal Bureau of Investigation agents. Id. at 353.

In United States v. Silva, 745 F.2d 840 (4th Cir. 1984), the arrestees were handcuffed behind their backs, and as they sat on a motel room bed, an officer searched a locked, zippered bag which contained two firearms and ammunition. Id. at 847. The Fourth Circuit upheld the search as incident to a lawful arrest. Id.

In United States v. Palumbo, 735 F.2d 1095 (8th Cir. 1984), the Eighth Circuit rejected the appellant's argument that a search was not incident to his arrest because "the cocaine, hidden behind a dresser drawer, was inaccessible to him because he was handcuffed and in the presence of several officers." Id. at 1097.

The Majority has failed to cite any decision that supports its theory that the fact that a person is handcuffed and covered by more than one police officer makes a weapon three feet away inaccessible. Its dictum to that effect is contrary to the express holdings of four of our sister circuits.

The undisputed evidence, when viewed in the light most favorable to the Government, shows that Officer Azzarano decided to search the backpack when he noted that Myers kept looking at the bag and "he was getting more and more nervous as he answered my questions. His voice was more shaking and halting." Officer Azzarano further testified that based on his experience as an officer "[t]he defendant's demeanor led me to believe that there was something in the bag that he didn't want me to see." As discussed in the authorities cited above, whether or not Myers could get to the bag to open it is not relevant in determining whether the search was incident to the arrest. In discussing the

question of accessibility at the time of a search, the D.C.

55

Circuit reasoned as follows in United States v. Lyons, 706
F.2d 321 (D.C. Cir. 1983):

> Custodial arrests are often dangerous; the police must
> act decisively and cannot be expected to make
> punctilious judgments regarding what is within and
> what is just beyond the arrestee's grasp. Thus,
> searches have sometimes been upheld even when
> hindsight might suggest that the likelihood of the
> defendant reaching the area in question was slight.

Id. at 330 (citing United States v. Mason, 523 F.2d 1122,
1125-26 (D.C. Cir. 1975)).

CONCLUSION

I would affirm the district court's denial of the motion to
suppress. Based on Ms. McKnight's report, when Officer
Azzarano entered Ms. Bennett's residence, he had probable
cause to believe that she was threatened with imminent
bodily harm by an armed man. Officer Azzarano's entry into
the apartment without a warrant was also justified by
exigent circumstances -- to protect Ms. Bennett and her
children from physical injury. The facts he observed after
entering the apartment confirmed the eye witness report of
Ms. McKnight that Myers was committing a serious crime.

Officer Azzarano's search of Myers's backpack was
incident to a lawful arrest for a violation of
section 2701(a)(3), based on Ms. McKnight's reliable
information that a serious crime was being committed
within the residence, and the corroborating facts the officer
perceived within Ms. Bennett's residence. Myers's conduct
in Officer Azzarano's presence constituted an attempt by
physical menace to put Ms. Bennett in fear of imminent
serious bodily injury. The fact that Myers was in the
custody of two officers and handcuffed did not invalidate
the search as incident to a lawful arrest.

A True Copy:
Teste:

> Clerk of the United States Court of Appeals
> for the Third Circuit

56